**T.I.M.E.–DC, INC., Plaintiff-Appellant,**

v.

**MANAGEMENT–LABOR WELFARE & PENSION FUNDS, OF LOCAL 1730 INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Defendant-Appellee.**

No. 342, Docket 84–7314.

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1984.

Decided Feb. 22, 1985.

Carl L. Taylor, Washington, D.C. (T. Webster Brenner, Kirkland & Ellis, Washington, D.C., Bettina B. Plevan, Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for plaintiff-appellant.

Ernest L. Mathews, Jr., New York City (Kevin Marrinan, Susan G. Barres, Thomas W. Gleason, New York City, of counsel), for defendant-appellee.

Before NEWMAN, CARDAMONE and DAVIS,* Circuit Judges.

CARDAMONE, Circuit Judge:

In 1980 Congress enacted the Multiemployer Pension Plan Amendments Act (MPPAA or the Act) to shore up the finances of multiemployer plans and encourage their growth. An employer presently a member of one such plan has transferred some employees to a different location and has become liable to make contributions on their behalf to a new plan. The old plan has demanded payment of the employer's withdrawal liability. The employer refuses to pay until the old plan advises it of the amount of assets the old plan proposes to transfer to the new plan. Hence, there is a standoff because—like Alphonse and Gaston—neither will go first.

T.I.M.E.–DC, Inc. (TIME–DC) has sued the Management-Labor Welfare & Pension Funds of Local 1730 International Long-

---

* Honorable Oscar H. Davis, Circuit Judge for the Federal Circuit, sitting by designation.

shoremen's Association (ILA Fund) to prevent assessment of its withdrawal liability until the ILA Fund has transferred appropriate assets and liabilities into the Teamsters Trucking Employees of North Jersey Welfare Fund (Teamsters Fund). The Act provides that disputes over withdrawal liability should be resolved by arbitration, 29 U.S.C. § 1401, (MPPAA sections hereinafter referred to by sections of Title 29, U.S.C.) and that disputes over transfers should be resolved by appeal to the Pension Benefit Guaranty Board, § 1415(b). Since the parties cannot agree on what the Act requires, those administrative proceedings have not yet begun. To break the impasse, we undertake to interpret the controlling legislative provisions so that the withdrawal liability and interplan transfer disputes can be resolved.

I

Appellant TIME–DC is an interstate freight motor carrier that operates throughout the United States. The ILA Fund, an unincorporated association, is a multi-employer pension plan within the meaning of §§ 1002(37)(A), 1301(a)(3). Until December 15, 1980 TIME–DC maintained a terminal at Carteret, New Jersey. Local 1730 of the International Longshoremen's Association (ILA Local 1730) was the collective bargaining representative for a number of TIME–DC platform employees at the Carteret terminal. Under its collective bargaining agreement TIME–DC contributed on behalf of these employees to the ILA Fund.

When business at the Carteret facility slowed, TIME–DC closed the terminal on December 15, 1980. It transferred approximately 19 employees represented by ILA Local 1730 to its terminal at North Bergen, New Jersey. There, Local 641 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers (Teamsters Local 641) represented a unit comprised of TIME–DC drivers and platform workers. Under its collective bargaining agreement with that Local, TIME–DC contributed on behalf of those employees to the Teamsters Fund. After a union jurisdictional battle, the NLRB ruled on March 12, 1981 that the platform workers transferred from Carteret to North Bergen would be subject to the jurisdiction of Teamsters Local 641. The Regional Director concluded "that the transferred platform employees constitute[d] an accretion to the existing driver-platform unit." This ruling prompted TIME–DC to withdraw from the ILA Fund and assume new responsibility toward the Teamsters Fund.

By letter dated March 30, 1981 TIME–DC notified the ILA Fund that because of a "certified change of collective bargaining representative" it would cease making contributions. The letter requested that the ILA Fund fulfill its duty under the MPPAA § 1415 and transfer assets and liabilities to the Teamsters Fund. Three days later the trustees of the ILA Fund notified TIME–DC that they would undertake to calculate its withdrawal liability as required under the Act. In September 1982 the ILA Fund advised the employer that its withdrawal liability under a three-year payment schedule amounted to $228,000 and that the first quarterly payment was due October 1, 1982, later extended to October 11.

On October 7, 1982 TIME–DC filed a complaint in the Southern District of New York seeking declaratory and injunctive relief from the "threat of prosecution, enforcement, or collection" of the claim made against it under the withdrawal liability provisions of the MPPAA. TIME–DC challenged the constitutionality of the employer withdrawal liability provisions. It also claimed that the ILA Fund's assessment of withdrawal liability was without effect because the Fund failed to first comply with § 1415, the MPPAA's transfer of assets and liabilities provisions. In its answer the ILA Fund asserted that the employer was precluded from bringing suit until it exhausted its administrative remedies, as required by § 1401.

On February 29, 1984 United States District Judge Vincent L. Broderick granted the ILA Fund's motion for summary judgment. The district judge held that the

withdrawal liability provisions of the statute are constitutional, that compliance with § 1415 is not a condition precedent to the application of the withdrawal liability provisions, §§ 1381 *et seq.*, and that § 1401 requires the parties to resolve further disputes over withdrawal liability in arbitration. The district court further held that plaintiff was not entitled to injunctive relief.

Subsequent to the district court's ruling, the Supreme Court upheld the constitutionality of the withdrawal liability provisions. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* — U.S. —, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *see also Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843 (2d Cir. 1984). Hence, TIME–DC no longer challenges the Act's constitutionality, but seeks review only of the statutory issues raised below. The arbitration provisions of § 1401 do not prevent a court from resolving issues of statutory interpretation. Judge Broderick correctly held that compliance with § 1415 transfer provisions is not a condition precedent to the determination and demand of an employer's withdrawal liability. Nonetheless, we remand this case to the district court so that it can direct the ILA Fund to give TIME–DC the notice required by § 1415(b)(2).

## II

In 1974 Congress enacted the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1381 (ERISA sections hereinafter referred to by sections of Title 29, U.S.C.). ERISA was designed to ensure that employees and their beneficiaries would not be deprived of anticipated benefits from their private retirement pension plans. *See R.A. Gray & Co.,* 104 S.Ct. at 2713 (1984) (citing *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361–62, 374–75, 100 S.Ct. 1723, 1726, 1732–1733, 64 L.Ed.2d 354 (1980)). *See also* § 1001(a). Congress also created the Pension Benefit Guaranty Corporation (PBGC), a wholly-owned government corporation within the Department of Labor.

§ 1302. The PBGC guarantees the payment of benefits to plan participants and beneficiaries, paying the plan's obligations if the plan terminates with insufficient assets to support its guaranteed benefits. *R.A. Gray & Co.,* 104 S.Ct. at 2713. By the late 1970s Congress became aware that ERISA did not adequately provide for the continued financial growth of multiemployer pension plans. A significant number of multiemployer plans were experiencing extreme financial hardship that Congress feared would result in termination of numerous plans, forcing the PBGC to assume obligations in excess of its limits. *See Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d at 847–49 (discussing the background of the MPPAA).

If an employer withdraws from a plan after its employees' benefits have vested, but before it meets all of its funding obligations, the plan may be left with sizeable unfunded vested liabilities. Prior to the MPPAA, an employer that had paid all required contributions to a multiemployer plan could withdraw from the plan, and if the plan did not terminate within five years after withdrawal, the employer had no further responsibility for the plan's unfunded liabilities. This provided an "undesirable incentive for employers to withdraw from plans and an unfair burden on the employers who continue[d] to maintain the plans." H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2993, 3001. This state of affairs strained the resources of multiemployer plans and jeopardized the financial stability of the PBGC. Had Congress permitted this situation to continue, the burdens of plan failure ultimately would have fallen upon employees and their beneficiaries.

The policy of the MPPAA, enacted in 1980, was to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans. H.R.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 65, *reprinted*

*in* 1980 U.S.Code Cong. & Ad.News 2918, 2933; H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S. Code Cong. & Ad.News 2993, 2995. Secretary of Labor Marshall testified before Congress that one of the key elements of the PBGC's legislative proposal was

> that an employer that leaves the multiemployer pension plan would be required to pay its fair share of the plan's vested liabilities. The objective of this element is to discourage withdrawals and to provide a financial cushion for the plan which is not now provided by the present system because of the limitations of liability and the absence of any disincentive to withdraw.

*Multiemployer Pension Plan Amendments Act of 1980: Hearings on H.R. 3904 Before Subcomm. on Labor-Management Relations of the House Comm. on Education and Labor,* 96th Cong., 1st Sess. 362 (1979). The Act forces an employer that withdraws from a plan to pay its share of the benefits that have accrued to plan participants and for which the plan continues to be liable. By placing the funding burden on the withdrawing employer, the Act relieves the PBGC of the potentially crippling burden of paying out inordinate amounts of insurance. It also reduces an employer's incentive to withdraw from the plan to escape paying for vested benefits that its employees have earned, but that the employer has not yet funded.

Part One of Subtitle E of ERISA §§ 1381–1405, states the rules and procedures for the calculation and collection of the amounts that an employer must pay upon complete or partial withdrawal from a multiemployer pension plan. Section 1383(a) states that a "complete withdrawal from a multiemployer plan occurs when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." Sections 1385, 1386, and 1388 deal with partial withdrawal by the employer. Section 1389 through 1393 and 1405 set forth the method for computing withdrawal liability. The Act outlines detailed rules for both the notice requirements and collection of the payment in § 1399. Section 1401 provides for arbitration to resolve disputes over the amount of the withdrawal liability. Part Two of Subtitle E applies when a multiemployer plan merges with another multiemployer plan or when a multiemployer plan engages in the transfer of assets and liabilities to or from another multiemployer or single-employer plan. The goal of these merger and transfer rules is to avoid reducing the benefits of any participant or beneficiary. § 1411(b)(2).

The specific part of the Act upon which we focus is § 1415, which is entitled "Transfer pursuant to change in bargaining representative." Section 1415 applies when an employer has withdrawn from a multiemployer plan (the "old plan") as a result of a "certified change of collective bargaining representative" and employees who participated in the "old plan" will, as a result of that change, participate in another multiemployer plan (the "new plan"). The section requires that notice be given and sets forth procedures for transferring assets and liabilities from the old to the new plan. The section also provides for appeal to the PBGC to ensure that the new plan will not suffer substantial financial harm as a result of the transfer.

### III

The first issue to be decided is whether this case is properly before us. In the court below, the ILA Fund argued that TIME–DC failed to exhaust its administrative remedies. After resolving the constitutional challenge and the issue of statutory interpretation, the district judge correctly ruled that if an employer disputes *the amount* of its withdrawal liability, then it must proceed to arbitration.

 As a general rule a party must exhaust its administrative remedies before it can invoke the jurisdiction of the courts. *See Myers v. Bethlehem Steel Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The Act requires the parties to resolve "[a]ny dispute be-

tween an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 [of Title 29]" by arbitration. § 1401. This private arbitration procedure—although different from government administrative proceedings—is the administrative remedy that parties are directed to use before turning to a judicial forum. Nonetheless, this and other circuits have held that the arbitration provisions of the MPPAA do not constitute a bar to federal jurisdiction. Rather, the requirement of exhaustion of administrative remedies in this context is a prudential matter within our discretion. *See, e.g., T.I.M.E.–DC, Inc. v. New York State Teamsters Conference Pension & Retirement Fund*, 580 F.Supp. 621, 633 (N.D.N.Y.), *aff'd*, 735 F.2d 60 (2d Cir.1984) (*per curiam*); *I.A.M. National Pension Fund Benefit Plan C v. Stockton TRI Industries*, 727 F.2d 1204, 1207–10 (D.C.Cir.1984); *Republic Industries v. Teamsters Joint Council No. 83 Pension Fund*, 718 F.2d 628, 634 (4th Cir.1983); *see also F.H. Cobb Co. v. New York State Teamsters Conference*, 584 F.Supp. 1181, 1183 (N.D.N.Y.1984); *Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund*, 580 F.Supp. 1457, 1460–61 (S.D.N.Y. 1984); *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund*, 560 F.Supp. 294, 301–03 (E.D.N.Y.1983). Courts have recognized exceptions to the exhaustion doctrine in some situations when the doctrine's policies are not implicated. These policies include the application of the administrative body's superior expertise, promotion of judicial economy, and deference to the statutory scheme Congress created. The most common exceptions are found when the nonjudicial remedy is inadequate, statutory interpretation is required or there is a constitutional question.

 The Act subjects to arbitration factual issues the resolution of which is necessary to calculate withdrawal liability. These might include, for example, the number of employees covered or the dollar amount of benefits that have vested. Disputes over these issues are not subject to judicial decision. But the determination of whether compliance with § 1415 transfer provisions is a condition precedent to the assessment of withdrawal liability is an issue of statutory interpretation. *See generally Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970); *McKart v. United States*, 395 U.S. 185, 197–98, 89 S.Ct. 1657, 1664–65, 23 L.Ed.2d 194 (1969). Resolution of this issue does not implicate the underlying justifications for exhaustion. First, there are no questions of fact or issues of contract interpretation to resolve. Thus "an arbitrator skilled in pension and labor matters would have no superior expertise to offer." *See Stockton TRI Industries*, 727 F.2d at 1210. Moreover, arbitration will not promote judicial economy as the parties would probably seek judicial review of any decision an arbitrator might reach. *Id.* Finally, there is no indication that Congress contemplated that § 1401(a)(1) would empower an arbitrator to make decisions outside the context of sections 1381 through 1399. The issue here involves the interaction of § 1415 with the withdrawal liability provisions and, as such, is outside the scope of those issues that Congress directed to the arbitrator. *See Refined Sugars*, 580 F.Supp. at 1461.

## IV

TIME–DC argues that it is not required to pay any withdrawal liability until the ILA Fund has transferred assets and liabilities to the Teamsters Fund pursuant to § 1415. It asks us to hold that ILA's fulfillment of both transfer and notice requirements of § 1415 is a condition precedent to its payment of the withdrawal liability. We find no such requirement in the statute. Instead, the Congressional scheme directs us to Part One of the Act to determine the timing of an employer's payment obligations.

 The goal of the withdrawal and transfer provisions of the MPPAA is to ensure that the employer covers its pension obligations in both the old and the new

plans. When an employee is transferred from an old unit to a new unit, responsibility for paying pension benefits follows the employee. The employer must thereafter contribute to the new plan to fulfill its funding obligations on behalf of that employee. If employees whose benefits have vested are not transferred to the new plan, then the old plan continues to be responsible for paying those employees' benefits. The term "withdrawal liability" simply is a way of describing an employer's obligation, under its collective bargaining agreement, to continue to fund the old plan to the extent that that plan remains responsible to the employees upon their retirement. The statute further requires the old plan to reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees. In this way the statute reaches a proper allocation of the employer's payments on behalf of its employees. It ensures that both plans are funded and avoids the possibility of double payments by the employer.

The mechanics of the Act's meticulously designed notification scheme are plain. Once the employer withdraws from the plan, it becomes the plan sponsor's duty to calculate the amount of withdrawal liability. When, as a result of the employer's withdrawal, some employees will participate in a new multiemployer plan, the amount of withdrawal liability that the old plan requests should be reduced by the amount of unfunded vested benefits that it will transfer to the new plan. § 1391(e). To gather the information it needs to make this calculation, the plan sponsor may request the employer to furnish any necessary information. The employer must respond to such requests within 30 days. § 1399(a).

Section 1399(b)(1) is the heart of the notice and collection scheme in Part One. It states that:

> As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall—

(A) notify the employer of—

> (i) the amount of the liability, and

> (ii) the schedule for liability payments, and

(B) demand payment in accordance with the schedule.

The most significant aspect of the notice scheme is that no matter what disputes arise between the old plan sponsor and the employer over the amount of liability, the employer is obligated to pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the payment schedule under § 1399(b)(1).

In its earlier drafts, Congress provided for an informal review process to occur before the plan sponsor demanded payment. The plan sponsor could demand payment only after the employer had a "reasonable opportunity to identify any inaccuracy in the determination of its withdrawal liability or the schedule of payments" and after the plan sponsor responded to the matters raised by the employer. *Multiemployer Pension Plan Amendments Act of 1980: Hearings on H.R. 3904 Before Subcomm. on Labor-Management Relations of the House Comm. on Education and Labor*, 96th Cong., 1st Sess. 24, 26 (1979) (§ 4201(e)(f)(2) and (3) of draft of MPPAA). But just before passing the Act, Congress redrafted it to allow the plan sponsor to demand payment before review occurred, and thereby avoid delay in the commencement of an employer's payment of its withdrawal liability. Congress made the requirement that the employer promptly pay its withdrawal liability obligations crystal clear in § 1399(c)(2):

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.[1]

---

**1.** When the statute refers to "review" it means the informal review process outlined in

The PBGC has ameliorated the potential harshness of this pay-first-question-later system by providing that the employer shall not be considered in default until the sixty-first day after the review and arbitration process is complete. PBGC regulations, 29 C.F.R. § 2644.2(c) (1984). The employer is still liable for payment during the review and appeal period, and interest accrues during that period, but the plan sponsor cannot consider the employer to be in default and accelerate its demand for the entire payment. The employer can also put its withdrawal liability into an escrow account, or pay the plan sponsor on time and get back any overpayment with interest. *See* 29 C.F.R. § 2644.2(d). TIME–DC has paid its withdrawal liability into an escrow account.

The transfer provisions of § 1415 do not alter this Congressional aim of requiring the employer to begin paying according to the plan sponsor's § 1399(b)(1)(B) demand. Under § 1415 the old and new plans must agree on the amounts of assets and liabilities that should be transferred from the old to the new plan. Once they have agreed, the old plan sponsor, in calculating the employer's withdrawal liability, must compute the amount by which the employees' unfunded vested benefits transferred exceeds the value of employer contributed assets transferred to determine by what amount it must reduce the withdrawal liability. § 1415(c). Then, if the old plan sponsor has already calculated the withdrawal liability and demanded payment, it must compare the actual amounts to be transferred to the new plan with the amounts, if any, it estimated under § 1391(e) in determining the withdrawal liability and adjust the employer's withdrawal liability accordingly.

As with § 1399, the fact that the new plan or the employer disputes the amount that the old plan proposes to transfer does not relieve the employer of its obligation to pay the withdrawal liability according to the payment schedule set by the sponsors of the old plan. If the new plan appeals to the PBGC and the employer is required to pay its withdrawal liability before the appeal is settled (unless 180 days has elapsed since the filing of the appeal), then the employer must pay its withdrawal liability in escrow. § 1415(d). The old plan will return any overpayment to the employer with interest. Amounts received by the old plan will be credited against the withdrawal liability due. *Id.* Thus § 1415 supports the requirement that the employer begin paying its withdrawal liability even though there is a dispute over the precise amount due. Compliance with § 1415 is not, as TIME–DC contends, a precondition to the payment of withdrawal liability.

V

The central problem in this case is that the parties have not agreed on the amounts to be transferred from the old plan to the new plan and have not used the proper statutory procedures to resolve the dispute. TIME–DC's position is that its withdrawal liability is overstated because the old plan has not taken into account the transfers it should make to the new plan. The ILA Fund takes the position that § 1415 does not apply and, therefore, it has no duty to transfer any assets and liabilities to the new plan.

The application of § 1415 raises mixed questions of law and fact. In this case, the issues of fact are undisputed, leaving only the issues of law for the courts, and not the arbitrator, to decide. We find that the

---

§ 1399(b)(2)(A) under which the employer, no later than 90 days after it receives the plan sponsor's § 1399(b)(1) notice, may ask the plan sponsor to review the determination to correct any inaccuracy. Section 1399(b)(2)(B) directs the plan sponsor to respond to the employer's request "after a reasonable review of any matter raised." The "appeal" refers to the formal arbitration proceedings provided for in § 1401. *See*

§ 1401(d) ("Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination").

employer's arguments present sufficient grounds for applying § 1415. Section 1415 provides that when an employer has withdrawn from an old plan as a result of a "certified change of a collective bargaining representative", and employees under the old plan participate in the new plan, the old plan shall transfer assets and liabilities to the new plan.

■ First, it is conceded that TIME–DC has completely withdrawn from the ILA Fund within the meaning of § 1383(a). Second, there has been a "certified change of collective bargaining representative." § 1415(g)(2) ("a 'certified change of collective bargaining representative' means a change of collective bargaining representative under the Labor-Management Relations Act [29 U.S.C. §§ 141 *et seq.*]"). On March 2, 1981, a Regional Director of the NLRB ruled that the Teamsters Local 641, and not ILA Local 1730, was the bargaining representative for the TIME–DC employees transferred to the North Bergen terminal. Appellee argues that before § 1415 applies there must be a totally new bargaining representative, not just the transfer of an old unit into an existing unit. We find that when the NLRB rules that a group of employees previously represented by one unit will be under the jurisdiction of a second unit, there has been a "certified change of collective bargaining representative." Appellee's fears that this interpretation of the MPPAA will burden the old plan are unfounded. In the end, the employer will be required to provide for its share of the unfunded vested benefits of both plans.

The mechanism of § 1415 is essential to achieve that goal.

■ Finally, the employer has shown that some of the participants of the old plan will participate in the new plan. Appellee argues that because the new plan will cover so few of these workers, perhaps as few as five out of 19, § 1415 is inapplicable. The number of employees ultimately covered by the new plan is relevant only with respect to the amount of assets and liabilities to be transferred to the new plan; the applicability of the statute does not hinge on the actual number of employees transferred. The arbitrator may well determine that there is no transfer liability.

■ Thus, recognizing that § 1415 applies in this case, the employer served notice on the sponsors of the old plan within 30 days of the NLRB ruling pursuant to the terms of § 1415(b)(1). The old plan must now provide the notice to the employer and the sponsor of the new plan required under § 1415(b)(2)(A), (B).[2] The ILA Fund has not given the required notice, so we therefore direct the district court on remand to order the ILA Fund to do so. Once the ILA Fund provides that notice, this event will trigger the other provisions of § 1415, and the parties should be able to agree on the amount of assets and liabilities that the old plan should transfer to the new plan.[3] At the same time, the employer may pursue its arbitration rights under § 1401 if it disputes other aspects of the withdrawal liability calculation.

**2.** The old plan sponsor must notify the employer of the following:

 (i) the amount of the employer's withdrawal liability determined under part 1 of this subtitle with respect to the withdrawal,

 (ii) the old plan's intent to transfer to the new plan the nonforfeitable benefits of the employees who are no longer working in covered service under the old plan as a result of the change of bargaining representative, and

 (iii) the amount of assets and liabilities which are to be transferred to the new plan. § 1415(b)(2)(A). The old plan sponsor must also notify the new plan sponsor of the benefits, assets, and liabilities it will transfer to the new plan. § 1415(b)(2)(B).

**3.** The trustees of the new plan may bring an appeal of the transfer determination before the PBGC. This review by the PBGC, along with the fiduciary duty that the plan sponsors, as trustees, owe the plan, ensures that the transfer of assets and liabilities lead to full and fair funding of the new plan so that participants and beneficiaries receive their vested benefits. *See Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, (D.C.Cir.1984) (trustees' fiduciary duties require them to act neutrally and reasonably in making withdrawal liability determinations).

## VI

TIME–DC also sought an injunction preventing the application of the MPPAA. As the employer has voluntarily put its withdrawal liability funds into escrow as required by the Act, there appears to be no reason for us to decide this issue. The district court's grant of summary judgment to appellee is vacated, and the case is remanded for further proceedings consistent with this opinion.