John BOWERS, Donald Carson, James G. Costello, Michael E. Maher, Anthony Pimpinella, Anthony J. Tozzoli, as Trustees for and on behalf of the NYSA–ILA Pension Trust Fund, Plaintiffs,

v.

P.T. DJAKARTA LLOYD, Defendant.

No. 87 Civ. 2820 (CSH).

United States District Court,
S.D. New York.

April 27, 1989.

On Motion For Partial Reargument
Sept. 13, 1989.

**482**

Lambos & Giardino, Thomas W. Gleason, New York City, for plaintiffs.

Robert Delson, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The individual plaintiffs are trustees for and on behalf of the NYSA–ILA Pension Trust Fund (the "Fund"). They bring this action against defendant P.T. Djakarta Lloyd ("Djakarta") to collect amounts allegedly owing to the Fund by Djakarta for withdrawal liability pursuant to the Multiemployer Pension Plan Amendments Act, ("MPPAA" or the "Act"), 29 U.S.C. § 1381 *et seq.* (1982 and Supp. III 1985). The case is before the Court on the parties' cross-motions for summary judgment.

## BACKGROUND

The Fund was and is created and maintained in accordance with collective bargaining agreements covering the Port of New York and New Jersey (the "Port") entered into by the New York Shipping Association, Inc. ("NYSA") and the International Longshoreman's Association, AFL–CIO ("ILA") for the purpose of collecting and receiving contributions and providing benefits to eligible participants. Djakarta is an Indonesian corporation that operates as an ocean carrier of cargoes which it transports to and from various ports in the world. At all relevant times Djakarta was, and remains, a party to the NYSA–ILA collective bargaining agreements. The NYSA conducts labor negotiations for its members, ocean carriers that use the Port.

Djakarta has been engaged in operations in the Port since at least the 1960's. Until 1985, Djakarta's own vessels delivered cargoes to the Port and loaded cargoes there for ocean carriage to other ports. However, beginning in 1985 Djakarta conducted more and more of its carriage in the Port through another carrier, Dart Containerline ("Dart"). Dart is referred to as a "connecting carrier" because cargoes loaded at the Port of New York upon Dart vessels are thereafter transferred to Djakarta vessels for carriage to destination. These cargoes are carried pursuant to ocean bills of lading issued by Djakarta at the Port of New York.[1] Dart is a party to the NYSA–

---

**1.** A number of ocean bills of lading issued by Djakarta for loading of shipments in New York for carriage by Dart vessels are attached to the motion papers. I find no inward bills of lading, but assume from the averments of Djakarta's affidavits that Djakarta also used Dart vessels to

ILA collective bargaining agreements. Djakarta avers without contradiction that in each case where Dart acts as Djakarta's connecting carrier, Dart pays to the Fund the tonnage assessment called for by the Fund's provisions. Those arrangements apparently continue to this day.

On June 27, 1986 the Fund wrote to Djakarta's New York office to state that the Fund had "been advised of your cessation of operations in the Port of New York and New Jersey in 1985." The Fund advised Djakarta of its calculation of the latter's withdrawal liability under the MPPAA in the amount of $951,571.10, demanded payment, and forwarded a monthly payment schedule.[2]

Djakarta replied through its New York agent in a letter dated July 16, 1986. Djakarta advised that it had not ceased its operations in the Port, stating that "due to reorganization and current market conditions", it was unable to "schedule a New York call", but was "presently working toward a New York call in the near future." Therefore, Djakarta said, "we do not feel that we should be assessed with withdrawal liability penalty."

The Fund answered with a letter of August 25, 1986, reiterating its demand and calling Djakarta's attention to the fact that the first installment payment of that liability had not been made.

Djakarta replied with a letter dated September 8, 1986 enclosing a schedule advertising a renewal of calls at the prot of New York by Djakarta vessels. Djakarta also stated it was negotiating a new stevedoring contract due to the closing of its previous berthing facility at the South Brooklyn Marine Terminal.

Djakarta's New York agent wrote again to the Fund on September 12, 1986 to inquire whether "Djakarta Lloyd's connecting carrier agreements, both inward and outward, would be considered as an indirect contribution to the fund. If so, our records are at your disposal."

On December 11, 1986, counsel for Djakarta wrote the Fund as follows:

We request that you forward to us a formal statement of the withdrawal liability amount claimed and provide a calculation upon which this withdrawal liability has been determined. Additionally, would you kindly forward to us your latest I.R.S. Form 5500, with attachments. Upon our review of the requested information, we shall correspond with you again concerning the Fund's claim for withdrawal liability.

The Fund replied in a letter dated January 13, 1987:

In response to your request of December 11, 1986, enclosed is the calculation of your client's withdrawal liability prepared by the Fund's Actuary, Martin E. Segal Company.

Pursuant to the calculation made by the Actuary, demand is hereby made upon your client, P.T. Djakarta Lloyd, for the August 1st and November 1st, 1986 quarterly installments past due in the amount of $50,133 each. Thereafter, payments will be due in accordance with the annexed schedule.

The Fund maintains the position that the production of the other documentation which you have requested is premature and not provided for by MPPAA. In the event that your client elects to arbitrate this claim, the Fund will at that point consider your request.

In its initial affidavit on these motions, Djakarta claimed that the only enclosure to the Fund's January 13, 1987 letter was a list of the conclusory figures originally given; "wholly absent was the method by which those figures were reached." The Fund responded with an affidavit averring that its January 13, 1987 letter also enclosed copies of a letter dated January 8, 1987 from the Fund's actuary, Martin E. Segal Company, to the trustees setting forth the actuarial assumptions and calculations used to determine Djakarta's with-

---

carry cargoes for New York discharge under Djakarta bills of lading or other contracts of ocean carriage.

**2.** With interest the amount of withdrawal liability as calculated by the Fund totalled $1,220,-288.52 at the date of demand.

drawal liability. (The actuary's letter consists of a single page; his detailed analysis is nine pages long). Counsel for Djakarta submitted a further affidavit saying that the recipient of the Fund's January 13, 1987 letter, an attorney named O'Callaghan, searched through the "voluminous" file "and did find a copy of the Segal letter, which had apparently been placed in a part of the file separated from the correspondence." Counsel for Djakarta and its lay representative say they were not aware of the Segal letter of January 8, 1987; but it is abundantly clear that the Fund sent it to Djakarta's counsel.

Thus this aspect of the case comes down to the Fund's refusal to show counsel for Djakarta a copy of its "latest I.R.S. Form 5500, with attachments", as requested by counsel's letter of December 11, 1986. Djakarta argues that provisions of the Segal calculations "without I.R.S. Form 5500 with attachments is similar to providing a coded message without the key to the code." That is said to follow from the Form 5500's function as setting forth "information which could be used to verify, or find errors in, the figures and formula used to determine the defendant's alleged withdrawal liability."

The Fund concedes in its reply brief at 7 that the I.R.S. Form 5500 "contains financial information which might have a bearing on the amount of Djakarta's liability." However, the Fund argues, the form has no relevance to Djakarta's contention that it never withdrew, so that Djakarta did not need the form in order to initiate arbitration.

In a letter dated February 13, 1987, the Fund construed Djakarta's prior correspondence as a request for reconsideration of the Fund's determination of Djakarta's withdrawal liability. The Fund reaffirmed its prior determination of liability, giving its reasons in part as follows:

> Pursuant to ERISA § 4203(a), 29 U.S.C. § 1383(a), a complete withdrawal from a multi-employer plan occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. P.T. Djakarta Lloyd has neither operated a vessel nor paid tonnage assessments in the Port of New York and New Jersey since July 1, 1985. Therefore, in 1985 it ceased covered operations for which it had an obligation to contribute under the Plan. Withdrawal liability was triggered in accordance with the provisions of MPPAA. Your letters contend that P.T. Djakarta Lloyd has "Connecting Carrier Agreements." These arrangements with other carriers do not constitute covered operations under the Plan since no tonnage assessments have been paid by P.T. Djakarta Lloyd under these connecting carrier arrangements.

Djakarta quarrels with this analysis. It points out in the motion papers that it continues its presence in New York as an ocean carrier. Djakarta stresses that under the NYSA–ILA collective bargaining agreement, assessments for the Fund are keyed into the overall experience of loading and unloading cargo in the entire Port: that is, the aggregate tonnage loaded into and unloaded from all ships of carriers signatory to the collective bargaining agreement controls the amounts paid into the Fund. Djakarta stresses that it deals exclusively with a connecting carrier (Dart) which is also a signatory to that collective bargaining agreement; and resists the Fund's claim for withdrawal liability. In an argument summarized by one of the affidavits in opposition:

> It is the tonnage loaded and unloaded in the Port from vessels of signatory carriers that matters to the Fund; not whether the carrier uses its own ship or that of another signatory. Thus, Djakarta as a carrier fulfilled its obligations to the Pension Fund when cargo which it received as a carrier was arranged by Djakarta to be loaded and unloaded in the Port from ships of a signatory to the NYSA–ILA collective bargaining agreement, and only from such ships.

Such arguments did not persuade the Fund, which commenced this action on April 27, 1987. At first the Fund sought an order directing interim payments.

Shortly thereafter the Fund amended its motion to one for summary judgment in the amount of $951,571.10, together with interest, liquidated damages, declaratory relief and attorney's fees. Djakarta cross-moves for summary judgment dismissing the complaint.

## DISCUSSION

### Constitutionality

■ Djakarta challenges the constitutionality of retroactive withdrawal liability and arbitration proceedings under the MPPAA. The Second Circuit has held "that the retroactive application of the MPPAA withdrawal provisions is constitutional in all respects." *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.,* 725 F.2d 843 (2d Cir.1984). To the extent that decision addresses Djakarta's constitutional claims, I am bound by it. To the extent it does not, I am unpersuaded by Djakarta's arguments.

### Arbitrability

■ The Fund claims that since the issues between the parties were arbitrable under the Act, and Djakarta failed to initiate timely arbitration, Djakarta's withdrawal liability becomes fixed in the amount calculated by the Fund.

Djakarta claims that the issues turn solely upon statutory construction, so that recourse to arbitration was not required. Alternatively, Djakarta says the Fund by its actions has failed to meet the statutory conditions precedent for a suit for collection of withdrawal liability.

In determining these issues, it is useful to review the history and purpose of the MPPAA.

In 1974 Congress enacted the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* in order to "provide comprehensive regulation for private pension plans." *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 214, 106 S.Ct. 1018, 1020, 89 L.Ed.2d

166 (1986). ERISA was designed to insure that employees and their beneficiaries would not be deprived of anticipated retirement benefits before sufficient funds have been accumulated in the plans. *Id.* Subsequent to the enactment of ERISA, Congress became concerned " 'that ERISA did not adequately protect multiemployer plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans.' " *Connolly, supra,* at 215, 106 S.Ct. at 1021 (*quoting Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 722, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984)). Specifically, Congress was concerned about the threat to the solvency and stability of multiemployer plans caused by employer withdrawals. *Id.* The MPPAA addresses that concern.[3]

The MPPAA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). "The policy of the MPPAA, enacted in 1980, was to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans." *T.I.M.E.–DC v. Management–Labor Welfare & Pension Funds, of Local 1730 International Longshoreman's Association,* 756 F.2d 939, 943 (2d Cir.1985). Congress also created the Pension Benefit Guaranty Corporation ("PBGC"), a wholly-owned government corporation within the Department of Labor. The PBGC guarantees the payment of benefits to plan participants and beneficiaries, paying the plan's obligations if the plan terminates with insufficient assets to support its guaranteed benefits. *T.I.M.E.–DC, supra,* at 943. The Second Circuit described the particular purpose of withdrawal liability as follows:

> The Act forces an employer that withdraws from a plan to pay its share of the

---

**3.** This analysis tracks that of Judge Weinfeld in *Korea Shipping Corp. v. New York Shipping Association—International Longshoremen's Associ-* *ation Pension Trust Fund,* 663 F.Supp. 766, 768 (S.D.N.Y.1987).

benefits that have accrued to plan participants and for which the plan continues to be liable. By placing the funding burden on the withdrawing employer, the Act relieves the PBGC of the potentially crippling burden of paying out inordinate amounts of insurance. It also reduces an employer's incentive to withdraw from the plan to escape paying for vested benefits that its employees have earned, but that the employer has not yet funded.

*Id.* at 944.

In the case at bar, the Fund claims that Djakarta's liability arises out of its "complete withdrawal" from the plan, as that phrase is defined in 29 U.S.C. § 1383(a). That subsection provides:

> For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—
>
> (1) permanently ceases to have an obligation to contribute under the plan, or
>
> (2) permanently ceases all covered operations under the plan.

Djakarta denies that it has withdrawn from the plan. Djakarta contends that the undisputed facts concerning its use of Dart as connecting carrier, and the latter's contributions to the plan for which Djakarta is billed, demonstrate Djakarta's continuing "obligation to contribute under the plan", § 1383(a)(1), and its "continued operations under the plan", § 1383(a)(2).

The Fund does not confront these contentions head on so much as to argue that they were arbitrable under the statutory scheme; and, since Djakarta did not demand arbitration in timely fashion, it is now precluded from contesting its withdrawal liability as calculated initially by the Fund.

Section 1401(a) of the MPPAA provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). Arbitration must be initiated within proscribed time limits, § 1401(a)(1)(A), (B). Those limits have

elapsed without any demand for arbitration by Djakarta.

Under the law of this circuit, whether an issue is arbitrable under § 1401(a) depends upon its nature and whether its resolution requires fact finding. The distinction is illustrated by *T.I.M.E.–DC, supra* and the Second Circuit's more recent decision in *New York State Teamsters Conference Pension & Retirement Fund v. McNicholas Transportation Co.*, 848 F.2d 20 (2d Cir.1988).

In *McNicholas* the court of appeals said of § 1401(a)(1): "Notwithstanding the broad language of this section, we have ruled that a matter need not be submitted to arbitration where the only disputes concern constitutional questions or, in some circumstances, statutory interpretation." 848 F.2d at 22. *McNicholas* holds that an arbitrable "factual dispute arose when the Company argued to the Fund that it had ceased payments to its New York Employees solely because of [a] strike in Pittsburgh and the Fund responded that one had nothing to do with the other." *Id.* at 23. The factual issue, in short, was one of causation. The company's failure to make a timely demand for arbitration precluded it from contesting the issue in litigation, the court of appeals concluding that "since there was no joint request for arbitration, the company's withdrawal liability has become fixed." *Id.*

The *McNicholas* court distinguished *T.I.M.E.–DC, supra*, which held that arbitration was not required where there was no factual issue as to the reason for the employer's cessation of contributions. The fund in that case contended that withdrawal liability attached upon any cessation of contributions, regardless of reason; "and thus there was no need for any factfinder to determine whether the cessation had occurred" because of a labor dispute. *McNicholas* at 23.

The precise issue in *T.I.M.E.–DC* was whether compliance with transfer provisions in § 1415 of the MPPAA constituted a condition precedent to the assessment of withdrawal liability. That issue, the Second Circuit held, was one of statutory in-

terpretation not requiring arbitration. The court of appeals gave three reasons for its conclusion: there were "no questions of fact or issues of contract interpretation to resolve"; arbitration would not "promote judicial economy as the parties would probably seek judicial review of any decision an arbitrator might reach"; and since § 1401(a)(1) referred to arbitration of determinations made under §§ 1381 through 1399, the "interaction of § 1415 with the withdrawal liability provisions ... is outside the scope of those issues that Congress directed to the arbitrator." 756 F.2d at 945. The third of these reasons does not apply to the case at bar. Arguably the other two do.

Seven days before the Second Circuit decided *McNicholas* a different panel decided *ILGWU National Retirement Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879 (2d Cir.1988). In *ILGWU* a pension fund and its trustees brought an action against a dissolved corporation seeking to recover withdrawal liability. The corporation did not exhaust the arbitration remedy; and the court of appeals concluded that, if the fund had met the statutory condition precedent for a suit for collection (which the corporation also denied), the fund was entitled to judgment for the relief sought in the complaint. That was because the issues were arbitrable. "Here, issues of fact—such as, what contract obligations did the Corporation agree to and how did the Corporation conduct its affairs with respect to the union and the Fund—and issues of contract interpretation pervade the Corporation's argument." 846 F.2d at 886. It availed the defendant corporation nothing to argue that the issues turned in part upon the statute's meaning; the Second Circuit wrote: "Moreover, the issues of statutory interpretation raised by the Corporation largely involve interpretations under sections 1381 through 1399, interpretations which we believe Congress envisioned would be made by the arbitrator in the first instance." *Id.* Finally, the fact that the corporation had let the time to initiate arbitration expire counted against it:

Furthermore, if the Corporation's time for initiating arbitration proceedings has expired, as it apparently has, the propriety of waiving the exhaustion requirement would be all the more questionable. Congress intended that disputes over withdrawal liability would be resolved quickly, and established a procedural bar for employers who failed to arbitrate disputes over withdrawal liability in a timely manner. See 29 U.S.C. § 1401(b)(1). If a party wishes to seek judicial resolution of its dispute without first submitting to arbitration it should seek declaratory and/or injunctive relief against the imposition of withdrawal liability before the time period to initiate arbitration expires. *Cf.* [*I.A.M. National Pension Fund v.*] *Clinton Engines Corp.*, 825 F.2d [415] at 427–28 [(D.C.Cir.1987)]; [*IUE AFL–CIO Pension Fund v.*] *Barker & Williamson*, 788 F.2d [118] at 129 [(3rd Cir.1986)]. The failure to seek such relief on a timely basis may, in some instances, lead to a harsh result, but the harshness of the default is largely "a self-inflicted wound." 788 F.2d at 129.

*Id.* at 886–87.

In *Park South Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578 (2d Cir.1988), the Second Circuit did not disturb the parties' conclusion and the district court's agreement that the resolution of the particular MPPAA dispute involved "turned solely on a question of statutory interpretation." 851 F.2d at 582. However, the court of appeals went on to sound this note of caution:

In *T.I.M.E.–DC*, we held that "the arbitration provisions of MPPAA do not constitute an absolute bar to federal jurisdiction but instead constitute an exhaustion of administrative remedies requirement." *ILGWU Fund*, 846 F.2d at 887. In the present case, we concluded that exhaustion of the arbitration remedy is not required because (1) this case presents no factual issues but only legal questions of statutory interpretation, (2) the parties agreed that arbitration was not required, (3) the suit was filed before the time for invoking arbitration had expired, and (4)

judicial economy would not be served by remanding the case at this late state for arbitration, which almost certainly would be followed by further judicial proceedings. We intimate no view on whether arbitration would be required in a case in which all of these factors were not present, or which involved some of these, and also other factors. *Cf. ILGWU Fund* (arbitration required). *Id.* at 582.

While to a degree each case turns on its own circumstances, the recent Second Circuit trend requiring arbitration of MPPAA disputes is unmistakable. That trend is particularly apparent where, as here, the disputes arise out of sections 1381 through 1399. Given that thrust of recent appellate authority, I am unable to conclude that the issues at bar are limited to statutory construction and do not require arbitration. There is a surface plausibility to Djakarta's contention that the facts concerning its retention of Dart as a connecting carrier, and the latter's contributions to the Fund, are undisputed, so that Djakarta's separate liability becomes an issue of statutory interpretation, uncluttered by factual dispute. But the argument does not withstand analysis. The nature and extent of Djakarta's contractual obligations in this post–1985 mode of operation within the Port lie at the heart of the matter. To the extent that those issues involve statutory interpretation, the issue involves the application *vel non* to Djakarta's present situation of that definition of "complete withdrawal" contained in section 1383(a); and in *ILGWU, supra,* the Second Circuit expressed its belief that such interpretations "Congress envisioned would be made by the arbitrator in the first instance." The very limited criteria for non-arbitrability expressed by the court of appeals in *Park South Hotel Corp.* militate against such a finding in the case at bar.

■ The issue thus becomes whether the Fund, in its dealings with Djakarta, failed in material respects to comply with the procedural requirements of MPPAA. That is the issue upon which the court of appeals remanded *ILGWU* to the district court for

determination. 846 F.2d at 887. The practical significance is that if there was no procedural failure or refusal on the Fund's part the Fund is entitled to judgment for the relief sought in the complaint, given Djakarta's failure to initiate timely arbitration proceedings in respect of disputes which were arbitrable. "If, however, the conditions have not been met [by the Fund], then the court should dismiss the suit and direct the parties to pursue their administrative remedies." *Id.*

In that regard, Djakarta complains of the Fund's refusal to comply with Djakarta's request for a copy of the Fund's I.R.S. form 5500 and attachments. The Fund's position, expressed in the contemporaneous correspondence, is that it had it had no obligation to furnish that documentation short of arbitration proceedings, at which time the Fund "would consider" the request. The Fund takes that position, notwithstanding its concession that the documents constitute a potential source of financial information having a bearing on the amount of Djakarta's withdrawal liability.

I conclude that in refusing to make this documentation available to Djakarta when asked to do so, the Fund violated the spirit as well as the letter of the MPPAA. § 1399(b)(2)(A) provides that upon receipt of a notice of withdrawal liability, the employer:

(i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payment,

(ii) may identify any inaccuracy in the determination the amount of the unfunded vested benefits allocable to the employer, and

(iii) may furnish any additional relevant information to the plan sponsor.

The Second Circuit has said of these and related statutory provisions that they "afford the Fund and the employer an opportunity to iron out their differences, possibly eliminating an erroneous deprivation of an employer's property." *Textile Workers Pension Fund, supra,* 725 F.2d at 854. The court of appeals characterized these pre-arbitration inquiries as permission

granted to an employer "to furnish the plan with further information *or point out inaccuracies in the Fund's determination of liability." Id.* (Emphasis added). Clearly Djakarta'a purpose in obtaining the Fund's I.R.S. Form 5500 and attachments was to place Djakarta's counsel in the position, prior to arbitration, of pointing out to the Fund possible inaccuracies in the latter's determination of Djakarta's liability. This was a salutary and sensible request on Djakarta's part; and, given the statutory scheme, the Fund's refusal was unreasonable.

## CONCLUSION

Because the Fund has not complied with the procedural requirements of the MPPAA, its motion for summary judgment is denied.

Because the issues between the parties must be referred to arbitration under the statutory scheme, Djakarta's cross-motion for summary judgment is denied.

The parties are directed to pursue their administrative remedies.

The Clerk of the Court is directed to dismiss the complaint without prejudice and without costs or sanctions to either party.

It is SO ORDERED.

## ON MOTION FOR PARTIAL REARGUMENT

Plaintiff moves for partial reargument of this Court's Memorandum Opinion and Order dated April 27, 1989, familiarity with which is assumed.

The Court's prior Opinion concluded that, given certain aspects of the Fund's conduct, Djakarata was still entitled to test the claim for withdrawal liability in arbitration, notwithstanding its own failure timely to demand arbitration. The Fund does not attack that conclusion in its motion for reargument (although of course the Fund does not thereby abandon its right to challenge it at an appropriate time on appeal, if so advised).

In its reargument motion, the Fund focuses instead upon the first motion it

made in this case: for an order directing Djakarta to pay withdrawal liability installments while it contested its liability. I conclude that the Fund is correct in its contentions that the Court's prior opinion did not address that claim, and that the Fund is entitled to prevail upon it.

The motion papers in the case at bar support the Fund's argument that the motions for orders directing interim payments and for summary judgment in the total amount of withdrawal liability calculated by the Fund were and remain separate and distinct applications for judicial relief. Accordingly it was not accurate for the Court to say, as it did in the April 27, 1989 Opinion at 485, that "the Fund amended its motion [for interim payments] to one for summary judgment ..." The Fund's motion for summary judgment for the entire amount was denied, and arbitration ordered, for the reasons stated in the earlier opinion. But the motion for interim payments remains and was neither addressed nor decided in the prior opinion.

Although Djakarta, resisting reargument, contends otherwise, there is no procedural impediment to the relief which the Fund seeks in the present motion. The motion for reargument was timely filed under Local Rule 3(j). Accordingly the Clerk's judgment dismissing the complaint, filed on the same day as the reargument motion, becomes a nullity, and there is no need for the Fund to invoke Rule 59(e) of the Federal Rules of Civil Procedure. There is also no support in the case law or statute for Djakarta's contention that an order directing the payment of interim withdrawal liability installments "is available only through a plenary action." Brief in Opposition at 2. A claim for interim payments properly lies in the sort of proceeding which the Fund has commenced at bar.

As for the Fund's entitlement to interim payments, that is clearly established by *T.I.M.E.–D.C. v. Management–Labor Welfare & Pension Funds,* 756 F.2d 939, 946 and 946 n. 1 (2d Cir.1985). Reviewing the legislative history and the manner in which the MPPAA was drafted, the Second Cir-

cuit observed that "just before passing the Act, Congress redrafted it to allow the plan's sponsor to demand payment before review occurred, and thereby avoid delay in the commencement of an employer's payment of its withdrawal liability." That policy decision gave rise to 29 U.S.C. § 1399(c)(2), in which the MPPAA mandates interim scheduled payments of withdrawal liability "notwithstanding any request for review or appeal of determination of the amount of such liability or of the schedule." The Second Circuit's footnote to p. 946 makes it clear that "review" includes the arbitral testing of withdrawal liability to which I have held Djakarta entitled in the circumstances of the case. *See also ILGWA National Retirement Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 881–82 (2d Cir.1988) ("Moreover, during the pendency of any arbitration proceedings, payment must still be made in accordance with the sponsor's determination, with any subsequent adjustments to occur after the arbitrator's final decision.").

Djakarta points out that courts may deny interim withdrawal liability payments "based on equitable considerations", Brief in Opposition at 5; but Djakarta wholly fails to bring itself within the narrow and particular circumstances of extreme hardship required to avoid liability for such payments. Chief Judge Munson reviewed those circumstances in his comprehensive opinion in *New York State Teamsters Conference Pension & Retirement Fund v. McNicholas Transportation Company*, 658 F.Supp. 1469, 1472–73 (N.D.N.Y.1987) *aff'd* 848 F.2d 20 (2nd Cir.1988). Nothing resembling them is suggested at bar.

Plaintiffs' motion for reargument is granted. Counsel for plaintiffs may settle an order consistent with this Opinion on seven (7) days' notice.

It is SO ORDERED.